# United States District Court

## SOUTHERN DISTRICT OF INDIANA

**UNITED STATES OF AMERICA**

**V.**

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:17-mj-085

HECTOR RENE VILLANUEVA JR., -01
JESE MARTINEZ-COLIN, and -02
JULIO CESAR ROBLES-FLORES -03

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning at a date unknown, continuing up to and including February 8, 2017, in the Southern District of Indiana, the defendants HECTOR RENE VILLANUEVA JR., JESE MARTINEZ-COLIN, and JULIO CESAR ROBLES-FLORES did conspire to possess with intent to distribute and to distribute controlled substances, including 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841 and 846. I further state that I am a Special Agent, and that this complaint is based on the following facts:

See attached Affidavit

**Continued on the attached sheet and made a part hereof.**

[signature]
Daron Babcock, Special Agent (HSI)

**Sworn to before me, and subscribed in my presence**

February 10, 2017 at Indianapolis, Indiana
**Date**

Debra McVicker Lynch, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

[signature]
**Signature of Judicial Officer**

## AFFIDAVIT IN SUPPORT OF APPLICATION

Daron Babcock, being duly sworn under oath, states as follows:

## TRAINING AND EXPERIENCE

1. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, that is an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been employed by the United States Immigration and Customs Enforcement ("ICE"), and its predecessor, the United States Customs Service, since June 2001. I am currently assigned as a Special Agent with the ICE, Homeland Security Investigations ("HSI") office in Indianapolis, Indiana, and have been so assigned since July 2007. In connection with my official duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I also investigate violations of the federal money laundering and bulk cash smuggling laws, including, but not limited to, Title 18, United States Code, Sections 1956 and 1957, and Title 31, Section 5332. I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. I also have been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking offenses.

3. I have received training in investigations involving individuals smuggling, transporting and distributing illegal narcotics. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing

controlled substances, their utilization of stash houses and other storage facilities, their use of telephones and digital display paging devices, and their use of numerical codes and code words to conduct their transactions.

4. I have also received training in money laundering and bulk cash smuggling techniques utilized by drug trafficking organizations to launder, conceal, and transport illicit financial proceeds related to narcotics crimes throughout the United States and across international borders. I am familiar with the ways in which drug trafficking organizations transport their proceeds, including, but not limited to, their methods of collecting and transporting bulk currency, their use of passenger and commercial vehicles for concealment, their use of currency "mules" and handlers to avoid law enforcement detection, their use of stash houses and other storage facilities, and their use of sophisticated compartments and cross-border smuggling techniques.

5. I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, visual surveillance, the general questioning of witnesses, the use of informants, the use of pen registers, the utilization of telephone wiretaps, the execution of search warrants, and undercover operations.

6. My experience as a narcotics investigator, my participation in the investigation of narcotics organizations, my conversations with other officers and agents of both federal and other state and local law enforcement agencies familiar with narcotic trafficking and money laundering matters, and my training, form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein. Since this affidavit is being submitted for the limited purpose of obtaining arrest warrants as set forth below, I have not included each and every fact known to me concerning this investigation.

## PURPOSE OF THE AFFIDAVIT

7. This Affidavit is submitted in support of a Complaint charging Hector Rene VILLANUEVA JR., Jese MARTINEZ-COLIN, and Julio Cesar ROBLES-FLORES, for committing the crime of conspiring to possess with intent to distribute and to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(a)(1) and 846.

## SUMMARY OF INVESTIGATION

8. In the course of an ongoing investigation, law enforcement officers began working with a credible and reliable confidential informant (hereinafter, CS-1). As set forth below, other agents and I utilized CS-1 to conduct a total of four controlled purchases of methamphetamine from Hector Rene VILLANUEVA JR. (hereinafter, VILLANUEVA): December 8, 2016; December 14, 2016; February 2, 2017; and February 8, 2017. Through the course of the investigation, other agents and I learned that VILLANUEVA was engaged in an ongoing conspiracy to possess with intent to distribute and to distribute 500 grams or more of methamphetamine with the following individuals: Hector VILLANUEVA JR., Jese MARTINEZ-COLIN, and Julio Cesar ROBLES-FLORES. The details of these four controlled purchases are set forth below.

December 8, 2016 Purchase of Approximately 30 grams of Methamphetamine

9. On December 8, 2016, CS-1 met with law enforcement in furtherance of a planned controlled purchase of methamphetamine from Hector VILLANUEVA JR. (hereinafter, VILLANUEVA). At approximately 5:10 p.m., CS-1 placed a monitored and recorded telephone call to an individual known to him/her as "Junior" to discuss a purchase of methamphetamine from

VILLANUEVA. During this telephone call, VILLANUEVA advised CS-1 that they could meet in approximately 20 minutes at VILLANUEVA's residence located at 4171 Mackenzie Way, Indianapolis, IN.

10. Prior to the meeting taking place, CS-1's person and vehicle were searched and no contraband was located. CS-1 was provided with $900.00 in pre-recorded Indiana State Police (ISP) buy funds which was to be used to purchase methamphetamine.

11. At approximately 5:34 p.m., CS-1 placed another recorded telephone call to VILLANUEVA and he advised CS-1 that he was at his residence located at 4171 Mackenzie Way. CS-1 was then equipped with covert electronic recording equipment prior to being followed by law enforcement officers to the meeting with VILLANUEVA.

12. Law enforcement officers maintained constant surveillance of CS-1 as he/she drove to VILLANUEVA's residence. At approximately 5:43 p.m., CS-1 went inside VILLANUEVA's residence. While inside the residence, surveillance units monitored the conversations taking place between CS-1 and VILLANUEVA via an audio transmitter device.

13. At approximately 5:47 p.m., CS-1 exited VILLANUEVA's residence and left in his/her vehicle. Surveillance units maintained constant visual of CS-1's vehicle as he/she traveled from VILLANUEVA's residence to a predetermined meet location.

14. At approximately 5:57 p.m., CS-1's person and vehicle were searched with no contraband discovered. CS-1 turned over a plastic baggie to law enforcement containing a crystalline substance. The crystalline substance field tested positive for methamphetamine and had a field weight of approximately thirty (30) grams. CS-1 advised he/she had provided VILLANUEVA with the prerecorded ISP funds to purchase the methamphetamine. The covert audio/video equipment was also retrieved from CS-1's person; this equipment has been reviewed

by law enforcement, and it corroborates CS-1's post-buy information. The methamphetamine was subsequently transported to the ISP Post 52 laboratory for analysis.

December 14, 2016 Purchase of Approximately 62 Grams of Methamphetamine

15. On December 14, 2016, CS-1 met with law enforcement in furtherance of a planned controlled purchase of methamphetamine from VILLANUEVA. At approximately 5:49 p.m., CS-1 received a monitored and recorded telephone call from VILLANUEVA to discuss a purchase of methamphetamine from VILLANUEVA. During this telephone call, VILLANUEVA advised CS-1 that he was home and that CS-1 could meet him at VILLANUEVA's residence located at 4171 Mackenzie Way, Indianapolis, IN.

16. Prior to the meeting taking place, CS-1's person and vehicle were searched and no contraband was located. CS-1 was provided with $2,700.00 in pre-recorded ISP buy funds which was to be used to purchase methamphetamine.

17. CS-1 was then equipped with covert electronic recording equipment prior to being followed by law enforcement officers to the meeting with VILLANUEVA. Law enforcement officers maintained constant surveillance of CS-1 as he/she drove to VILLANUEVA's residence. At approximately 6:11 p.m., CS-1 went inside VILLANUEVA's residence. While inside the residence, surveillance units monitored the conversations taking place between CS-1 and VILLANUEVA via an audio transmitter device.

18. At approximately 6:17 p.m., CS-1 exited VILLANUEVA's residence and left in his/her vehicle. Surveillance units maintained constant visual of CS-1's vehicle as he/she traveled from VILLANUEVA's residence to a predetermined meet location.

19. At approximately 6:27 p.m., CS-1's person and vehicle were searched with no contraband discovered. CS-1 turned over a plastic baggie to law enforcement containing a

crystalline substance. The crystalline substance field tested positive for methamphetamine and had a field weight of approximately sixty-two (62) grams. CS-1 also returned $900 of the pre-recorded ISP buy funds. CS-1 advised he/she had provided VILLANUEVA with the pre-recorded ISP funds to purchase the methamphetamine. Upon providing VILLANUEVA the pre-recorded ISP funds, VILLANUEVA advised CS-1 that he was only able to obtain approximately sixty (60) grams of methamphetamine for CS-1 instead of the anticipated ninety (90) grams they had previously discussed. The covert audio/video equipment was also retrieved from CS-1's person this equipment has been reviewed by law enforcement, and it corroborates CS-1's post-buy information. The methamphetamine was subsequently transported to the ISP Post 52 laboratory for analysis.

<u>February 2, 2017 Purchase of Approximately 234 Grams of Methamphetamine</u>

20. On February 2, 2017, CS-1 met with law enforcement in furtherance of a planned controlled purchase of methamphetamine from VILLANUEVA. Prior to this date, CS-1 and VILLANUEVA had text and telephone conversations concerning the individual(s) providing VILLANUEVA with the methamphetamine. VILLANUEVA advised CS-1 that he/she would have to provide some form of monetary payment towards the methamphetamine before being given any methamphetamine by VILLANUEVA's source of supply.

21. At approximately 4:39 p.m., CS-1 placed a monitored and recorded telephone call to VILLANUEVA to discuss a purchase of methamphetamine from VILLANUEVA. During this telephone call, VILLANUEVA advised CS-1 that the person who was going to provide the methamphetamine to CS-1 was already enroute to VILLANUEVA's residence located at 4171 Mackenzie Way, Indianapolis, IN.

22. Prior to the meeting taking place, CS-1's person and vehicle were searched and no contraband was located. CS-1 was provided with $3,000.00 in pre-recorded HSI buy funds which was to be used as a down payment toward the purchase of eight (8) ounces of methamphetamine. CS-1 was then equipped with covert electronic recording equipment prior to being followed by law enforcement officers to the meeting with VILLANUEVA.

23. At approximately 5:10 p.m., surveillance units observed a white Volkswagen Jetta (IN plate XDT295) occupied by multiple Hispanic males parked in the driveway of VILLANUEVA's residence.

24. At approximately 5:12 p.m., CS-1 left the predetermined brief location and drove to VILLANUEVA's residence. Surveillance units maintained constant visual on CS-1's vehicle as he/she traveled to VILLANUEVA's residence.

25. At approximately 5:17 p.m., CS-1 arrived at VILLANUEVA's residence located at 4171 Mackenzie Way, Indianapolis, IN. Upon CS-1 arriving at the residence, a Hispanic male wearing a white shirt, later identified as VILLANUEVA, was observed exiting the Jetta and entering the residence with CS-1. The unidentified Hispanic male driver of the Jetta remained inside of the vehicle while VILLANUEVA and CS-1 went inside the residence.

26. While VILLANUEVA and CS-1 were inside the residence, surveillance units monitored the conversations taking place via an audio transmitter being utilized by CS-1. During the interaction, VILLANUEVA gave CS-1 a plastic vacuum sealed bag containing a crystalline substance. CS-1 then provided VILLANUEVA with the pre-recorded government funds.

27. As CS-1 left the residence and walked toward his/her vehicle, VILLANUEVA proceeded to exit the residence as well and got back into the white Jetta that was parked in front of the residence and occupied by the same unidentified Hispanic male driver. CS-1 observed

VILLANUEVA hand the unidentified Hispanic male what appeared to be the pre-recorded government funds. VILLANUEVA then exited the white Jetta and went back into his residence.

28. Upon CS-1 leaving VILLANUEVA's residence, the unidentified Hispanic male driving the white Jetta also left at the same time. Surveillance units attempted to follow the white Jetta after it left VILLANUEVA's residence but were unsuccessful once the vehicle began traveling at an excessive speed and erratically along the roadway.

29. At approximately 5:22 p.m., CS-1 left in his/her vehicle. Surveillance units maintained constant visual of CS-1's vehicle as he/she traveled from VILLANUEVA's residence to a predetermined meet location.

30. At approximately 5:30 p.m., CS-1's person and vehicle were searched with no contraband discovered. CS-1 turned over a plastic baggie to law enforcement containing a crystalline substance. The crystalline substance field tested positive for methamphetamine and had a field weight of approximately eight ounces (specifically, approximately 234 grams). CS-1 advised he/she had provided VILLANUEVA with the prerecorded HSI funds to purchase the methamphetamine. The covert audio/video equipment was also retrieved from CS-1's person; a law enforcement officer has reviewed this equipment and confirmed that it corroborates CS-1's description of the events described above. The methamphetamine was subsequently transported to the ISP Post 52 laboratory for analysis.

31. During a debrief, CS-1 advised upon his/her arrival, he/she observed VILLANUEVA exit the white Jetta and go inside of the residence with him/her. VILLANUEVA then provided CS-1 with the plastic vacuum sealed plastic bag containing the methamphetamine, which VILLANUEVA had on his person as he entered the residence with CS-1. Upon examining the methamphetamine, CS-1 provided VILLANUEVA with the pre-recorded government funds.

CS-1 advised he/she and VILLANUEVA then exited the residence. As CS-1 approached his/her vehicle, he/she observed VILLANUEVA enter the passenger side of the white Jetta and hand the unidentified Hispanic male driver what appeared to be the pre-recorded government funds. CS-1 then left the area as VILLANUEVA walked back into his residence.

32. Later on February 2, 2017, CS-1 called ISP Sgt. Taylor Shafer and advised that VILLANUEVA had called him/her and advised the driver of the white Volkswagen Jetta had called VILLANUEVA and advised he thought he was being followed after he left VILLANUEVA's residence. The driver advised VILLANUEVA that he had lost the vehicle following him shortly after leaving VILLANUEVA's residence.

33. Law enforcement database queries revealed the vehicle was registered to Idania Gomez Guillermo LLC, 1714 Century Circle South, Apt 2, Indianapolis, IN. On February 3, 2017, at approximately 10:00 a.m., HSI SA Daron Babcock drove by 1714 Century Circle South and observed the white Volkswagen Jetta parked in front of the entry door to apartment #2.

February 8, 2017 Purchase of Approximately 243 Grams of Methamphetamine

34. On February 8, 2017, at approximately 12:47 p.m., law enforcement officers established surveillance on the white Volkswagen Jetta (IN plate XDT295) parked near 1714 Century Circle South, Apt. 2, Indianapolis, IN. Investigators established surveillance of the white Jetta in advance of CS-1 meeting with VILLANUEVA later in the afternoon in order to complete another purchase of methamphetamine.

35. At approximately 1:15 p.m., CS-1 placed an audio recorded telephone call to VILLANUEVA, who advised CS-1 that they would be able to meet at his residence located at 4171 Mackenzie Way at around 2:30 p.m.

36. At approximately 1:57 p.m., CS-1 placed an audio recorded telephone call to VILLANUEVA, who answered the call and advised CS-1 that the individual providing VILLANUEVA with the methamphetamine for CS-1 would be able to provide CS-1 with approximately eight (8) ounces.

37. Prior to this date, CS-1 and VILLANUEVA had text and telephone conversations concerning the individual(s) providing VILLANUEVA with the methamphetamine. CS-1 was advised that he/she would have to provide some form of monetary payment towards the methamphetamine before being provided any methamphetamine by VILLANUEVA's source of supply.

38. At approximately 2:14 p.m., surveillance units observed a Hispanic male exit apartment #2 located at 1714 Century Circle South and enter the white Volkswagen Jetta. This Hispanic male was later identified as Jese MARTINEZ-COLIN. The Hispanic male was wearing a dark jacket, jeans, cap, and had glasses. The Jetta then traveled westbound along 79th Street and then got onto southbound I-465.

39. At approximately 2:27 p.m., CS-1's person and vehicle were searched with no contraband discovered. CS-1 was provided $5,500.00 in pre-recorded HSI and ISP funds to purchase approximately (8) ounces of methamphetamine. CS-1 was also equipped with covert audio/video recording equipment.

40. At approximately 2:35 p.m., CS-1 left the predetermined brief location and drove to VILLANUEVA's residence. Surveillance units maintained constant surveillance on the CS-1's vehicle as he/she traveled to VILLANUEVA's residence. At approximately 2:39 p.m., CS-1 arrived at VILLANUEVA's residence located at 4171 Mackenzie Way, Indianapolis, IN. CS-1 then walked inside of the residence to meet with VILLANUEVA.

41. At approximately 2:49 p.m., surveillance units observed the driver of the white Jetta, MARTINEZ-COLIN, meet with the driver of a blue Jeep (IL plate ZX96109) in the parking lot at a Steak and Shake restaurant located on W. Washington St near Holt Road. The driver of the blue Jeep was later identified as Julio ROBLES-FLORES.

42. The Hispanic male driver of the Jetta (MARTINEZ-COLIN) was observed exiting the Volkswagen and getting into the blue Jeep. A minute or two later, the Hispanic male driver of the Jetta was observed exiting the Jeep and getting back into the white Jetta. The white Jetta traveled westbound onto Washington Street and then got onto southbound I-465 where surveillance units lost visual of the vehicle. Additional surveillance units stayed at the Steak and Shake and maintained surveillance on the blue Jeep. Law enforcement database queries revealed the blue Jeep was a rental vehicle and surveillance units visually confirmed a Hispanic male was driving the vehicle.

43. While inside the residence, surveillance units monitored the conversations taking place between CS-1 and VILLANUEVA via an audio transmitter being utilized by CS-1. During the interaction, CS-1 was advised by VILLANUEVA that they were going to go meet his guy with the methamphetamine. This conversation was monitored by law enforcement, who also heard VILLANUEVA relay that they would be going to a Kroger parking lot to conduct this meeting.

44. At approximately 3:01 p.m., CS-1 and VILLANUEVA got into VILLANUEVA's black Ford Expedition and traveled towards Kentucky Avenue. At approximately 3:09 p.m., the black Ford Expedition was surveilled at a nearby Kroger Parking lot, located at 3361 Kentucky Avenue, Indianapolis, IN.

45. At approximately 3:12 p.m., the black Ford Expedition was surveilled as it returned to VILLANUEVA's residence located at 4171 Mackenzie Way. CS-1 exited the black Ford

Expedition and got into his/her vehicle and drove away from the area. Surveillance units maintained constant surveillance of CS-1's vehicle as he/she traveled from VILLANUEVA's residence to a predetermined meet location.

46. At approximately 3:22 p.m., CS-1's person and vehicle were searched with no contraband discovered. CS-1 provided investigators with a vacuum sealed plastic bag containing a crystalline substance. The crystalline substance field tested positive for methamphetamine and had a total field weight of approximately eight ounces (that is, approximately 243 grams). The methamphetamine was subsequently transported to the District 52 laboratory. The covert audio/video equipment was also retrieved from CS-1's person.

47. During a debrief, CS-1 advised that upon leaving the trailer park with VILLANUEVA in the black Ford Expedition, they traveled to a Speedway gas station located near the Kroger store on Kentucky Avenue. CS-1 advised that VILLANUEVA met up with the Hispanic male driver of the white Jetta and obtained the methamphetamine. CS-1 provided VILLANUEVA with the pre-recorded buy money and VILLANUEVA proceeded to give the buy money to the Hispanic male driver of the white Jetta (identified by law enforcement as MARTINEZ-COLIN). The clothing and physical description of the Hispanic male driver of the white Jetta provided by CS-1 matched the description of the driver surveillance units had observed earlier. CS-1 advised that after the deal took place, VILLANUEVA and CS-1 drove through the Kroger lot and went directly back to VILLANUEVA's residence; this was corroborated by the observations of the surveillance officers who were conducting surveillance of the controlled buy.

48. Following the meeting of MARTINEZ-COLIN with the occupant of the blue Jeep (ROBLES-FLORES), described above at paragraph 41, law enforcement officers had maintained surveillance on the blue Jeep, believing ROBLES-FLORES had likely provided methamphetamine

to MARTINEZ-COLIN (who later provided it to CS-1). At approximately 3:21 p.m., surveillance units watching the blue Jeep at the Steak and Shake parking lot (located on West Washington Street near Holt Road) observed the white Jetta driven by MARTINEZ-COLIN pull alongside the blue Jeep on the west side of the restaurant parking lot. The same Hispanic male driver observed by surveillance units earlier, MARTINEZ-COLIN, exited the white Jetta and got into the passenger side of the blue Jeep.

49. At approximately 3:24 p.m., a black Volkswagen Jetta with a paper tag drove into the west side parking lot and pulled up next to the passenger side of the blue Jeep. The Hispanic male driver of the black Volkswagen Jetta, later identified through Texas identification card as Jhonnatan Reyes, then exited the black Jetta and got into the front passenger seat of the blue Jeep, which was already occupied by ROBLES-FLORES. Several seconds after Reyes entered the blue Jeep, the driver of the white Volkswagen Jetta, MARTINEZ-COLIN, was observed exiting the rear passenger side of the blue Jeep, getting back into his white Jetta, and leaving the Steak and Shake parking lot westbound on Washington Street. The front seat passenger of the blue Jeep, Reyes, was then observed getting back into his black Volkswagen Jetta, and parked it in a different spot on the west side of the lot. Reyes was then seen reentering the front passenger seat of the blue Jeep, driven by ROBLES-FLORES.

50. At approximately 3:30 p.m., the two Hispanic male occupants of the Jeep, ROBLES-FLORES and Reyes, left the Steak and Shake and headed east on Washington Street and then turned south onto Holt Road. Upon leaving the parking lot, the blue Jeep was stopped by officers with the Indianapolis Metropolitan Police Department (IMPD) near Holt Road and Washington Street. The Hispanic male driver of the Jeep initially identified himself through a Mexican Consulate card as Lester Robles; he later admitted to officers that his real name was Julio

Robles and law enforcement database queries confirmed his true and correct name to be Julio ROBLES-FLORES. The Hispanic male passenger was identified through a Texas ID card as Jhonnatan Reyes (however, law enforcement fingerprint checks demonstrated that this individual was Honduran resident and illegal alien pending deportation proceedings, with a true name of Adonis Geovany Rodriguez).

51. Immediately after receiving conflicting stories from both ROBLES-FLORES and Reyes, a police canine was utilized along the exterior of the vehicle and gave a positive alert for the odor of controlled substances. Upon searching Reyes' person, officers located a large bundle of U.S. currency which was found in his front right pants pocket in addition to two cellular telephones which were in his front left sweater pocket. Upon searching ROBLES-FLORES' person, officers located a wallet containing a large sum of U.S. currency and four cellular telephones. In addition, there was a large bundle of U.S. currency located in the cup holder in the center console of the vehicle.

52. Pre-recorded buy money utilized for the earlier methamphetamine transaction at the Kroger store on Kentucky Avenue was located on both ROBLES-FLORES and Reyes; additional law enforcement buy money was located in the stack of U.S. currency found in the cup holder area of the blue Jeep's center console. ROBLES-FLORES advised officers that the money in the center console area belonged to him.

53. ISP Sgt. Taylor Shafer and IMPD Detective Danny Wilkerson then conducted an audio recorded interview with Reyes. Prior to conducting the interview, Reyes advised he understood the English language and subsequently signed an ISP Advice of Rights waiver.

54. Reyes stated that he was borrowing his friend "Romero's" black Volkswagen to meet the driver of the blue Jeep. Reyes stated he did not know the driver of the Jeep very well and

identified the driver as "Junior." Reyes claimed he was selling "Junior" (ROBLES-FLORES) a vehicle for $1,000 and was making $200 by selling the vehicle. Reyes claimed the money in his pocket was given to him by "Junior." Reyes also stated he had two cellular telephones so he could listen to music on one of them and talk to his family on the other one. Reyes gave verbal and signed consent for officers to search his two cellular telephones. Upon initially reviewing them, officers located a text in which Reyes stated he would provide the recipient with an "8-ball." Reyes claimed he sold a person an "8-ball" of marijuana for two video games. Reyes stated he did not know why money utilized in an earlier drug transaction was located on his person.

55. ISP Sgt. Taylor Shafer and HSI SA Daron Babcock then conducted an audio recorded interview with ROBLES-FLORES. Prior to conducting the interview, ROBLES-FLORES advised he understood the English language and signed an HSI Advice of Rights waiver. ROBLES-FLORES signed a Spanish language version of the HSI waiver form and was read the waiver in English by SA Babcock.

56. ROBLES-FLORES admitted that he had initially provided law enforcement with a fake Mexican identification card. ROBLES-FLORES was informed that the officers were conducting an investigation involving the driver of a white Volkswagen Jetta, and that this person had been followed to the Steak and Shake, and had been seen meeting with ROBLES-FLORES earlier in the day. ROBLES-FLORES was then asked if he knew the driver of the white Jetta. ROBLES-FLORES initially stated that he didn't know that person. When ROBLES-FLORES was then informed that he had been seen meeting with the driver of the Jetta, ROBLES-FLORES stated that he had seen that individual before, and said hello to that person, but that was the extent of his interaction. After officers explained that they had seen the driver of the Jetta getting into

ROBLES-FLORES' blue Jeep, ROBLES-FLORES admitted that this had, in fact, occurred, and that the purpose of the meeting was, "just to say hi."

57. ROBLES-FLORES was then told that the driver of the white Jetta had been involved in a methamphetamine transaction after he had been seen meeting with ROBLES-FLORES in the Steak and Shake parking lot. ROBLES-FLORES was told that officers had continued to watch ROBLES-FLORES after he was seen meeting with the driver of the white Jetta, and had been seen getting gas from a nearby Kroger gas station, and had been followed right back to the same Steak and Shake parking lot, where he was then seen meeting for a second time with the driver of the white Jetta. ROBLES-FLORES denied that this second meeting occurred, and claimed he was only at the parking lot to pick up another person.

58. When asked who ROBLES-FLORES was in the parking lot to pick up, ROBLES-FLORES stated he didn't know that person's name. When asked to confirm that he didn't know the name of the man who had been sitting in ROBLES-FLORES car when it was stopped, ROBLES-FLORES stated, "I know him, but I don't know his name." ROBLES-FLORES then claimed he called the person "Tigre." ROBLES-FLORES claimed that the only reason he came back to the Steak and Shake parking lot was to pick up Tigre.

59. At that point, ROBLES-FLORES was again confronted with the fact that the driver of the white Jetta had sold methamphetamine to another person, and had then come back and met with ROBLES-FLORES a second time. ROBLES-FLORES first claimed that this person (the driver of the white Jetta, MARTINEZ-COLIN), just said hi. ROBLES-FLORES was told that officers had seen the driver of the white Jetta sitting in ROBLES-FLORES car, and ROBLES-FLORES told officers that this person had just opened the door to the car (that is, hadn't gotten in to the vehicle). Officers reiterated that they had seen the driver of the white Jetta getting into the

vehicle, and ROBLES-FLORES acknowledged that was true. ROBLES-FLORES claimed he (the driver of the white Jetta, MARTINEZ-COLIN) had just gotten in to ROBLES-FLORES' vehicle "to say hi."

60. ROBLES-FLORES was specifically asked whether the driver of the white Jetta gave him anything. ROBLES-FLORES claimed that he had not gotten anything from the driver of the white Jetta. ROBLES-FLORES was told that money that had been used by law enforcement in the methamphetamine transaction that involved the driver of the white Jetta had been found on ROBLES-FLORES' person and in his vehicle. When asked where he got that money from, ROBLES-FLORES stated, "I just get it." ROBLES-FLORES was not able to explain where he got that money from. After ROBLES-FLORES was shown a photo demonstrating how law enforcement record the serial numbers on U.S. Currency that is used in controlled buys, ROBLES-FLORES then requested legal counsel and the interview was terminated.

61. ROBLES-FLORES was arrested on state felony drug charges for conspiracy to distribute methamphetamine and taken to the Arrestee Processing Center (APC) by the Marion County Sheriff's Office.

62. At approximately 5:30 p.m., law enforcement officers placed VILLANUEVA under arrest at his residence located at 4171 Mackenzie Way Drive, Indianapolis.

63. At approximately 5:48 p.m., ISP Sgt. Taylor Shafer and HSI SA Daron Babcock conducted an audio recorded interview with VILLANUEVA. Prior to conducting the interview, VILLANUEVA advised he understood the English language and signed an ISP Advice of Rights waiver.

64. VILLANUEVA advised that he had met with the driver of the white Volkswagen earlier that day at a gas station and that he had also met with the same individual the week prior at

his residence. VILLANUEVA identified the driver of the white Volkswagen Jetta as "Primo." VILLANUEVA claimed he had completed two prior ½ pound methamphetamine transactions with "Primo." VILLANUEVA identified "Primo's" telephone number as 317-830-2304. VILLANUEVA stated he met "Primo" at a gas station on Kentucky Avenue earlier that day and paid him approximately $5,500.00 in U.S. currency. VILLANUEVA claimed the money he paid "Primo" was for a prior drug debt. VILLANUEVA advised "Primo" was driving the white Jetta and wearing a baseball cap, dark hoodie, and glasses when he met him at the gas station. VILLANUEVA advised that he made approximately $500.00 off of each ½ pound methamphetamine deal he completed. VILLANUEVA told officers that he had $500 in drug proceeds in his jean pocket inside his residence from the earlier transaction.

65. VILLANUEVA signed an ISP Consent to Search form and turned over the U.S. currency he claimed as drug proceeds ($900), a digital scale, and a small user amount of marijuana located in his bedroom. Some of the U.S. currency recovered in the bedroom was pre-recorded buy money from the earlier methamphetamine transaction conducted at the Kroger store on Kentucky Avenue.

66. VILLANUEVA was then arrested on state felony drug charges for dealing methamphetamine and transported to the APC by the Marion County Sheriff's Office.

67. At approximately 10:40 p.m., surveillance units observed the aforementioned white Volkswagen Jetta (IN plate XDT295) arrive back at 1714 Century Circle South, Apt. 2, Indianapolis, IN. Law enforcement officers approached the Hispanic male driver who matched the description of the driver seen exiting the apartment earlier in the afternoon. The Hispanic male driver identified himself through a Nuevo Leon ID card as Nasario Martinez Pegeros; however, law enforcement database queries revealed his true and correct name to be Jese MARTINEZ-

COLIN. MARTINEZ-COLIN had $500.00 U.S. currency on his person at the time he was detained. ISP Sgt. Taylor Shafer called the telephone number provided by VILLANUEVA for his methamphetamine source of supply (317-830-2304) and a cellular telephone MARTINEZ-COLIN had in his pocket when he exited the white Jetta rang with Sgt. Taylor's cell phone number showing on the caller ID. In addition, some of the U.S. currency located in MARTINEZ-COLIN's wallet was pre-recorded buy money from the earlier methamphetamine transaction at the Kroger store on Kentucky Avenue. MARTINEZ-COLIN advised he resided in apartment #2 at 1714 Century Circle South, Indianapolis, IN; in addition, MARTINEZ-COLIN advised officers that the white Jetta belonged to his girlfriend, who currently resides in Greenwood, but she allows him to use the vehicle. A key to the apartment was also found on the key chain for the white Volkswagen Jetta.

68. MARTINEZ-COLIN was advised of his Miranda Rights by HSI SA Daron Babcock and he requested legal counsel so no further interview was conducted. MARTINEZ-COLIN was then arrested on state felony drug charges for conspiracy to distribute methamphetamine and was transported to the APC by the Marion County Sheriff's Office.

69. ISP Sgt. Taylor Shafer applied for a search warrant in Marion County for 1714 Century Circle South, Apt. 2, Indianapolis, IN; the warrant was reviewed by Deputy Prosecuting Attorney Rick Frank with the Marion County Prosecutor's Office and subsequently received judicial approval. The warrant specifically authorized law enforcement officers to search the apartment for pre-recorded buy money related to the eight (8) ounce methamphetamine purchase which occurred on February 2, 2017 at VILLANUEVA's residence. ISP Troopers Dan Madison, Nate Raney, and HSI SA Daron Babcock executed the search warrant but none of the pre-recorded law enforcement buy money from the February 2, 2017 methamphetamine purchase was located inside the apartment.

70. On February 9, 2017, ISP Sgt. Taylor Shafer reviewed the serial numbers on the U.S. currency seized following the arrests of the four suspects the previous day and determined that $5,300.00 of the $5,500.00 in pre-recorded law enforcement buy money had been recovered.

## CONCLUSION

WHEREFORE, based upon the information contained in this Affidavit, probable cause exists for the arrest of Hector VILLANUEVA JR. for committing the crime of distribution of 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(a)(1). In addition, probable cause also exists for the arrests of Jese MARTINEZ-COLIN, and Julio ROBLES-FLORES for committing the crime of conspiracy to distribute methamphetamine, in violation of Title 21, United States Code, Section 846.

Daron Babcock, Special Agent
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

Sworn to and subscribed to me this
10th say of February, 2017.

Debra McVicker Lynch
Magistrate Judge
Southern District of Indiana